UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,　　　　)
　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　　　　　Plaintiff,　　　　)
　555 4th St, NW, Wash, DC 20530 )
　　　　　　　v.　　　　　　　　)　　　Civil Action No.
　　　　　　　　　　　　　　　　)
OREST GALAN,　　　　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　　　　　Defendant.　　　　)
　　　　　　　　　　　　　　　　)

<u>COMPLAINT</u>

I.　<u>INTRODUCTION</u>

1.　This is an action pursuant to Section 340(a) of the
Immigration and Nationality Act of 1952, as amended (INA), 8
U.S.C. § 1451(a), to revoke the citizenship of Defendant Orest
Galan ("Defendant"), to set aside the order of the United States
District Court for the Northern District of Illinois dated
September 8, 1970, granting Defendant United States citizenship,
and to cancel Certificate of Naturalization No. 9492495, issued
to Defendant pursuant to that Order.

2.　Plaintiff is the United States of America.

3.　Defendant is a natural person whose last known address
was 9585 45th Way North, Pinellas Park, Florida 33782.  Defendant
permanently departed from the United States on or before November
15, 2006.

- 2 -

II.   JURISDICTION AND VENUE

4.   Jurisdiction is conferred upon this Court by 28 U.S.C. § 1331 (which provides that the district courts shall have original jurisdiction of all civil actions arising under the laws of the United States), 28 U.S.C. § 1345 (which provides that, except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions commenced by the United States) and by Section 340(a) of the INA, 8 U.S.C. § 1451(a) (which provides that an action to revoke citizenship is to be brought in a district court).

5.   Venue is proper in this District under Section 340(a) of the INA, 8 U.S.C. § 1451(a) (which provides that an action to revoke citizenship may be brought in the United States District Court for the District of Columbia if the naturalized citizen does not reside in any judicial district in the United States at the time the suit is brought).

6.   As required by Section 340(a) of the INA, 8 U.S.C. § 1451(a), an affidavit showing good cause for this action is attached as Exhibit A, signed by Dr. Elizabeth B. White, Chief Historian and Deputy Director, Office of Special Investigations, Criminal Division, United States Department of Justice.

III.   FACTS

A.   Defendant's Activities Before and During World War II

7.   Defendant was born on November 18, 1921, in Hlinyany, Poland (now a part of Ukraine).

8.    On August 1, 1941, the Government of Nazi Germany incorporated eastern Galicia, in present-day western Ukraine, into the so-called Government General, a territory occupied by Germany that comprised the central and southern part of prewar Poland.  The new Galician territory, designated District Galicia, was ruled from the city of L'viv, which the Germans called Lemberg.  In August 1941, the German Commander of the Order Police for District Galicia directed the formation of Ukrainian auxiliary police forces ("Ukrainian Auxiliary Police") to aid German occupation authorities in policing the district.

9.    In District Galicia, overall control of security and implementation of anti-Jewish policy, including the mass murder of Jews, was the responsibility of the SS and Police Leader ("SSPF").  Under the SSPF, a senior Gestapo officer oversaw all anti-Jewish measures.

10.    The SSPF was at the top of a chain of command which extended to the Ukrainian Auxiliary Police.  The members of the Ukrainian Auxiliary Police in L'viv were uniformed, armed, paid a salary, and given various other benefits by the German authorities.  Throughout its existence, the Ukrainian Auxiliary Police was operationally directed and controlled by Nazi German security authorities.

11.    Enforcement of Nazi persecutory policies in District Galicia against the Jews and other racial or religious groups was one of the principal responsibilities of German security authorities.  The policy toward the Jews had three components. First, all Jews in the district were confined in ghettos and

issued new identification papers that identified them as Jews.
Second, all Jews were forcibly removed from the ghetto for
subsequent murder either by shooting or gassing.  Third, a
limited number of Jews whom the Germans considered fit for labor
were transferred to forced labor camps where many died from
starvation, disease, overwork and other inhumane conditions.
Under the direction of Nazi German security authorities, the
Ukrainian Auxiliary Police in L'viv participated in implementing
all three of these components.

12.  The Ukrainian Auxiliary Police was divided into
"commissariats."  Each commissariat was responsible for a
geographically defined section of the city and was tasked to
enforce German rule, including day-to-day enforcement of anti-
Jewish policies.

13.  On or about January 1, 1943, Defendant began working
for the 1st Commissariat of the Ukrainian Auxiliary Police in
L'viv.  The 1st Commissariat had responsibility for the center of
the city, where most offices of the German security authorities
were located.  The commissariat's northern boundary abutted the
southern edge of the Jewish ghetto.  The Defendant served in the
1st Commissariat until the spring of 1943.  Sometime between
January and May 1943, the Defendant was transferred to the 3rd
Commissariat, where he served until at least May 1944.  The 3rd
Commissariat, the UAP's third largest, was responsible for a
wedge-shaped section of L'viv to the southeast of the city
center.

14.   On a routine and daily basis, the Ukrainian Auxiliary Police in L'viv, including the 1st and 3rd Commissariats, enforced Nazi persecutory measures against those whom the Nazis deemed dangerous or undesirable because of their race, religion, national origin or political belief, especially the Jews in the city.   Ukrainian Auxiliary Policemen routinely checked personal identification documents and arrested Jews lacking special work passes.   Ukrainian Auxiliary Policemen also routinely arrested Jews for failure to wear an armband bearing the Star of David symbol that publicly identified them as Jews.   Defendant, as a uniformed, armed member of the 1st and 3rd Commissariats, had the responsibility to enforce such laws on a day-to-day basis throughout his tenure in the Ukrainian Auxiliary Police.

15.   The visible, public presence of armed, uniformed members of the 1st Commissariat of the Ukrainian Auxiliary Police provided a conspicuous display of intimidation in L'viv.   As a result, the Jews of L'viv more readily submitted to Nazi anti-Jewish measures.   Defendant, as an armed, uniformed member of the 1st and 3rd Commissariats of the Ukrainian Auxiliary Police contributed to that public intimidation of the Jews in L'viv.

16.   Between March 1942 and June 1943, virtually all of the more than 100,000 Jews in L'viv were seized and transported to killing sites, including the Belzec extermination center, or forced labor camps.   Members of the 1st and 3rd Commissariats participated in many, if not all, of these ghetto "reduction" operations.   Defendant was a member of the 1st and 3rd

Commissariats during the final phase of these operations, *i.e.*, from January through June 1943.

17.   Throughout most of June 1943, the UAP, including the 3rd Commissariat, provided forces for the final liquidation of the Jewish ghetto, during which armed Jewish resistance was suppressed by participating forces and some 12,000 Jewish victims were removed and most murdered.  UAP men from the 3rd Commissariat assisted in manning cordon posts in the city, searching and clearing residential buildings that housed Jews, escorting seized Jews to a central assembly point, guarding seized Jews in commissariat lock-ups, and escorting the Jews to Janowska forced labor camp, where most were shot to death.  Galan was serving in the 3rd Commissariat during this period and his service helped make it possible for the 3rd Commissariat to carry out its duties during the final liquidation of the ghetto.

18.   On November 21-23, 1943, in conjunction with the mass killing of all Jews remaining under Nazi control in L'viv, all members of the UAP were ordered onto the streets of L'viv on successive days to cordon the city, to check the identity papers of everyone leaving the city – particularly, according to orders issued by the UAP, persons who "looked like Jews" – and to comb the former Jewish district for Jews who had managed to remain in hiding or acquire false identification documents.  The operation involved all UAP men available at every commissariat and continued around the clock.  The Defendant was still serving with the 3rd Commissariat of the UAP during that operation and participated as well.

B.    Defendant's Immigration to the United States

19.    In June 1950, Defendant sought a determination from the United States Displaced Persons Commission (DPC) that he was a Displaced Person as defined in the Displaced Persons Act of 1948, Pub. L. No. 80-774, ch. 647, 62 Stat. 1009, as amended on June 16, 1950, by Pub. L. No. 81-555, Ch. 262, 64 Stat. 219 (amended DPA), and was therefore eligible to immigrate to the United States under the amended DPA.

20.    In applying with the DPC, Defendant misrepresented his employment and residences from 1943 to 1944, claiming that he had lived in L'viv [Lwow] from 1937 to March 1943, where he had been a "pupil" and had worked as a "laborer" with the firm "Elegant." He also stated that he had served as a worker in a glass factory in Dresden, Germany, from March 1943 to May 1945.

21.    In making these claims, Defendant concealed his service, from January 1943 until at least May 1944, in the 1st and 3rd Commissariats of the Ukrainian Auxiliary Police in L'viv.

22.    Relying upon Defendant's misrepresentations, the DPC determined that Defendant was an eligible Displaced Person.

23.    On or about June 29, 1950, Defendant filed an Application for Immigration Visa and Alien Registration with the American Consulate in Munich, Germany, to obtain a non-quota immigration visa to the United States under the amended DPA.

24.    On his visa application, Defendant misrepresented his residences from 1943 to 1944, stating that he had resided in Dresden, Germany, from March 1943 to May 1945.

25.  On his visa application, Defendant concealed that he resided in L'viv between January 1943 and at least May 1944.

26.  In the course of applying for a non-quota immigration visa under the amended DPA, Defendant orally swore to the truth of the information on his visa application.

27.  Based on the false information provided by Defendant to U.S. authorities, on or about June 29, 1950, Defendant was issued Immigration Visa No. I-501861 under the amended DPA.

28.  Defendant used this immigration visa to enter the United States at the Port of Boston, Massachusetts, on or about July 22, 1950.

C.    Defendant's Naturalization

29.  On or about July 30, 1970, Defendant signed and filed a Petition for Naturalization with the United States Immigration and Naturalization Service.  He orally swore to the truth of the information he provided therein.

30.  On September 8, 1970, the United States District Court for the Northern District of Illinois granted Defendant's Petition for Naturalization and issued to him Certificate of Naturalization No. 9492495.


IV.    LAW

31.  Section 340(a) of the INA, 8 U.S.C. § 1451(a) requires the revocation of Defendant's citizenship and the cancellation of his Certificate of Naturalization if these were illegally procured.

32.  Section 316 of the INA, 8 U.S.C. § 1427, sets forth the requirements for legally procuring naturalized citizenship. Section 316 (a)(1), applicable to Defendant, provides:

> No person, except as otherwise provided in this title, shall be naturalized unless such petitioner, (1) immediately preceding the date of filing his petition for naturalization has resided continuously, <u>after being lawfully admitted for permanent residence</u>, within the United States . . . [emphasis added].

**COUNT I**

<u>Illegal Procurement of U.S. Citizenship:</u>
<u>Unlawful Admission under the Amended DPA</u>
(Assistance to the Enemy in Persecution)

33.  Plaintiff realleges and incorporates by reference paragraphs 1 through 32, <u>supra</u>, of this Complaint.

34.  As set forth in paragraphs 19 through 28, <u>supra</u>, Defendant entered this country under the provisions of the amended DPA.

35.  Section 13 of the amended DPA prohibited the issuance of a visa to any person who "advocated or assisted in the persecution of any person because of race, religion, or national origin."

36.  Defendant's service with the Ukrainian Auxiliary Police in L'viv, as alleged in paragraphs 13 through 18, <u>supra</u>, constituted assistance in the persecution of persons because of race, religion, or national origin.  Defendant was thus ineligible to receive a visa under the amended DPA.

37.  Because Defendant was ineligible for a visa under the amended DPA, his admission into the United States pursuant thereto was unlawful.

38.  Because Defendant's admission into the United States was unlawful, his subsequent naturalization was unlawful under Section 316(a)(1) of the INA, 8 U.S.C. § 1427(a)(1).

39.  Defendant's citizenship thus was illegally procured and must be revoked, as provided for in Section 340(a) of the INA, 8 U.S.C. § 1451(a).

**COUNT II**

Illegal Procurement of U.S. Citizenship
Unlawful Admission under the Amended DPA
(Membership in a Hostile Movement)

40.  Plaintiff realleges and incorporates by reference paragraphs 1 through 32, supra, of this Complaint.

41.  As set forth in paragraphs 19 through 28, supra, Defendant entered this country under the provisions of the amended DPA.  Section 13 of the amended DPA also prohibited the issuance of a visa

> to any person who is or has been a member of, or participated in, any movement which is or has been hostile to the United States or the form of government of the United States.

42.  Defendant's service with the Ukrainian Auxiliary Police of L'viv, as alleged in paragraphs 13 through 18, supra, constituted membership or participation in a movement hostile to the United States or to the form of government of the United States.  Defendant therefore was ineligible to receive a visa

under the amended DPA, and his admission into the United States
pursuant thereto was unlawful.

43.  Because Defendant's admission into the United States
was unlawful, his subsequent naturalization was unlawful under
Section 316(a)(1) of the INA, 8 U.S.C. § 1427(a)(1).

44.  Defendant's citizenship thus was illegally procured and
must be revoked, as provided for in Section 340(a) of the INA, 8
U.S.C. § 1451(a).


### COUNT III

Illegal Procurement of U.S. Citizenship:
Unlawful Admission under the Amended DPA
(Willful Misrepresentation)

45.  Plaintiff realleges and incorporates by reference
paragraphs 1 through 32, supra, of this Complaint.

46.  As set forth in paragraphs 19 through 28, supra,
Defendant entered this country under the provisions of the
amended DPA.

47.  Section 10 of the amended DPA rendered inadmissible to
the United States any alien who willfully misrepresented material
facts for the purpose of gaining admission to the United States
as an eligible Displaced Person.

48.  Defendant willfully misrepresented material facts for
the purpose of gaining admission into the United States when he:
(i) sought a determination from the DPC that he was an eligible
Displaced Person, as alleged in paragraphs 19 through 22, supra;
and (ii) sought an immigration visa under the amended DPA, as

alleged in paragraphs 23 through 27, _supra_.  Defendant was, therefore, ineligible to receive a visa under the amended DPA.

49.  Because Defendant was not eligible to receive a visa under the amended DPA, his admission into the United States pursuant thereto was unlawful.

50.  Because Defendant's admission into the United States was unlawful, his subsequent naturalization was unlawful under Section 316(a)(1) of the INA, 8 U.S.C. § 1427(a)(1).

51.  Defendant's citizenship thus was illegally procured and must be revoked, as provided for in Section 340(a) of the INA, 8 U.S.C. § 1451(a).


**COUNT IV**

Illegal Procurement of U.S. Citizenship:
Unlawful Admission under State Department Regulations
(Acquiescence in Conduct Contrary
to Civilization and Human Decency)

52.  Plaintiff realleges and incorporates by reference paragraphs 1 through 32 of this Complaint.

53.  At the time that Defendant applied to enter the United States and at the time of his entry into the United States, regulations promulgated by the Department of State pursuant to authority delegated by Presidential proclamation forbade the issuance of a visa to any alien who either

>    (j) . . . has . . . acquiesced in activities
>    or conduct contrary to civilization and human
>    decency on behalf of the Axis countries
>    during the present World War.
>
>    [or]

> (k) . . . [is not in a specifically defined
> class], but in whose case circumstances of a
> similar character may be found to exist,
> which render the alien's admission
> prejudicial to the interests of the United
> States, which it was the purpose of the act
> of June 21, 1941 (55 Stat. 252) to safeguard.

22 C.F.R. § 53.33 (1949).

54.   Defendant's service with the Ukrainian Auxiliary Police in L'viv, as alleged in paragraphs 13 through 18, supra, constituted such acquiescence as set forth in 22 C.F.R. § 53.33(j).  It was also of such a character as to render his admission to this country prejudicial to the interests of the United States under 22 C.F.R. § 53.33(k).  By either standard Defendant was ineligible to receive a visa.

55.   Because Defendant was not eligible to receive a visa under the State Department regulations, his admission into the United States was unlawful.

56.   Because Defendant's admission into the United States was unlawful, his subsequent naturalization was unlawful pursuant to Section 316(a)(1) of the INA, 8 U.S.C. § 1427(a)(1).

57.   Defendant's citizenship was thus illegally procured and must be revoked pursuant to Section 340(a) of the INA, 8 U.S.C. § 1451(a).


IV.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests:

1.   A declaration that Defendant procured his citizenship and Certificate of Naturalization illegally.

2.    A judgment that revokes the United States citizenship of Defendant, that sets aside the Order of the United States District Court for the Northern District of Illinois dated September 8, 1970, admitting Defendant to citizenship, and cancels Certificate of Naturalization No. 9492495, issued pursuant to that order.

3.    A judgment forever restraining and enjoining Defendant from claiming any rights, privileges, benefits, or advantages under any document evidencing United States citizenship.

4.    A judgment requiring Defendant to surrender immediately and deliver to the Attorney General his Certificate of Naturalization No. 9492495, his United States passport, should he have one, and any other indicia of United States citizenship.

5.    Such other relief as may be lawful and proper.

Respectfully submitted,

JEFFREY A. TAYLOR
United States Attorney
    for the District of Columbia


ELI M. ROSENBAUM
Director

SUSAN L. SIEGAL
Principal Deputy Director


RUDOLPH CONTRERAS
Chief, Civil Division
U.S. Attorney's Office
District of Columbia
501 3rd Street, N.W.
Suite 4500
Washington, DC 20530
(202)514-7151


WILLIAM HENRY KENETY V
Senior Trial Attorney
Office of Special Investigations
Criminal Division
U.S. Department of Justice
10th St. & Constitution Ave., NW
John C. Keeney Building, Ste. 200
Washington, D.C. 20530
(202) 616-2492
(fax) (202)616-2491
william.kenety@usdoj.gov


Dated: 11/16/06

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. |
| OREST GALAN, | ) | |
| Defendant. | ) | |

## AFFIDAVIT OF GOOD CAUSE IN SUPPORT OF COMPLAINT

### (EXHIBIT A)

Dr. Elizabeth B. White declares under penalty of perjury as follows:

1.   I am the Chief Historian and Deputy Director at the Office of Special Investigations, Criminal Division, United States Department of Justice, and, as such, have access to records and information of the U.S. Department of Homeland Security, as well as other agencies and organizations, regarding the wartime activities, immigration, and naturalization of Orest Galan ("Defendant"). These records and this information form the basis for this affidavit.

2.   Defendant was born on November 18, 1921, in Hlinyany, Poland (now a part of Ukraine).

3.   On August 1, 1941, the Government of Nazi Germany incorporated eastern Galicia, in present-day western Ukraine, into the so-called Government General, a territory occupied by

Germany that comprised the central and southern part of prewar Poland.  The new Galician territory, designated District Galicia, was ruled from the city of L'viv, which the Germans called Lemberg.  In August 1941, the German Commander of the Order Police for District Galicia directed the formation of Ukrainian auxiliary police forces ("Ukrainian Auxiliary Police," UAP) to aid German occupation authorities in policing the district.

4.    In District Galicia, overall control of security and implementation of anti-Jewish policy, including the mass murder of Jews, was the responsibility of the SS and Police Leader ("SSPF").  Under the SSPF, a senior Gestapo officer oversaw all anti-Jewish measures.

5.    The SSPF was at the top of a chain of command that extended to the Ukrainian Auxiliary Police.  The members of the Ukrainian Auxiliary Police in L'viv were uniformed, armed, paid a salary, and were given various benefits by the German authorities.  Throughout its existence, the Ukrainian Auxiliary Police was operationally directed and controlled by Nazi German security authorities.

6.    Enforcement of Nazi persecutory policies in District Galicia against the Jews and other racial or religious groups was one of the principal responsibilities of German security authorities.  The policy toward the Jews had three components. First, all Jews in the district were confined in ghettos and issued new identification papers that identified them as Jews.

issued new identification papers that identified them as Jews. Second, all Jews were forcibly removed from the ghetto for subsequent murder either by shooting or gassing.  Third, a limited number of Jews whom the Germans considered fit for labor were transferred to forced labor camps, where many died from starvation, disease and other inhumane conditions.  Under the direction of Nazi German security authorities, the Ukrainian Auxiliary Police in L'viv participated in implementing all three of these components.

7.   The Ukrainian Auxiliary Police was divided into "commissariats."  Each commissariat was responsible for a geographically defined section of the city and was tasked to enforce German rule, including day-to-day enforcement of anti-Jewish policies.

8.   On or about January 1, 1943, Defendant began working for the 1st Commissariat of the Ukrainian Auxiliary Police in L'viv.  The 1st Commissariat had responsibility for the center of the city, where most offices of the German security authorities were located.  The commissariat's northern boundary abutted the southern edge of the Jewish ghetto.  The Defendant served in the 1st Commissariat until the spring of 1943.  Sometime between January and May 1943, the Defendant was transferred to the 3rd Commissariat, where he served until at least May 1944.  The 3rd Commissariat, the UAP's third largest, was responsible for a

- 4 -

wedge-shaped section of L'viv to the southeast of the city
center.

9.  On a routine and daily basis, the Ukrainian Auxiliary
Police in L'viv, including the 1st and 3rd Commissariats,
enforced Nazi persecutory measures against those whom the Nazis
deemed dangerous or undesirable because of their race, religion,
national origin or political belief, especially the Jews in the
city.  Ukrainian Auxiliary Policemen routinely checked personal
identification documents and arrested Jews lacking special work
passes.  Ukrainian Auxiliary Policemen also routinely arrested
Jews for failure to wear an armband bearing the Star of David
symbol that publicly identified them as Jews.  Defendant, as a
uniformed, armed member of the 1st and 3rd Commissariats, had the
responsibility to enforce such laws on a day-to-day basis
throughout his tenure in the Ukrainian Auxiliary Police.

10.  The visible, public presence of armed, uniformed
members of the 1st Commissariat of the Ukrainian Auxiliary Police
provided a conspicuous display of intimidation in L'viv.  As a
result, the Jews of L'viv more readily submitted to Nazi anti-
Jewish measures.  Defendant, as an armed, uniformed member of the
1st and 3rd Commissariats of the Ukrainian Auxiliary Police,
contributed to that public intimidation of the Jews in L'viv.

11.  Between March 1942 and June 1943, virtually all of the
more than 100,000 Jews in L'viv were seized and transported to
killing sites, including the Belzec extermination center, or

forced labor camps.  Members of the 1st and 3rd Commissariats
participated in many, if not all, of these ghetto "reduction"
operations.  Defendant was a member of the 1st and 3rd
Commissariats during the final phase of these operations, i.e.,
from January through June 1943.

12.  Throughout most of June 1943, the UAP, including the
3rd Commissariat, provided forces for the final liquidation of
the Jewish ghetto, during which armed Jewish resistance was
suppressed by participating forces and some 12,000 Jewish victims
were removed and most murdered.  UAP men from the 3rd
Commissariat assisted in manning cordon posts in the city,
searching and clearing residential buildings that housed Jews,
escorting seized Jews to a central assembly point, guarding
seized Jews in the commissariat lock-ups, and escorting the Jews
to Janowska forced labor camp, where most were shot to death.
Galan was serving in the 3rd Commissariat during this period and
his service helped make it possible for the 3rd Commissariat to
carry out its duties during the final liquidation of the ghetto.

13.  On November 21-23, 1943, in conjunction with the mass
killing of all Jews remaining under Nazi control in L'viv, all
members of the UAP were ordered onto the streets of L'viv on
successive days to cordon the city, to check the identity papers
of everyone leaving the city – particularly, according to orders
issued by the UAP, persons who "looked like Jews" – and to comb
the former Jewish district for Jews who had managed to remain in

hiding or acquire false identification documents.  The operation involved all UAP men available at every commissariat and continued around the clock.  The Defendant was still serving with the 3rd Commissariat of the UAP during that operation and participated as well.

14.  In June 1950, Defendant sought a determination from the United States Displaced Persons Commission (DPC) that he was a Displaced Person as defined in the Displaced Persons Act of 1948, Pub. L. No. 80-774, ch. 647, 62 Stat. 1009, as amended on June 16, 1950, by Pub. L. No. 81-555, Ch. 262, 64 Stat. 219 (amended DPA), and was therefore eligible to immigrate to the United States under the amended DPA.

15.  In his application to the DPC, Defendant misrepresented his employment and residences from 1943 to 1944, claiming that he had lived in L'viv [Lwow] from 1937 to March 1943, where he had been a "pupil" and had worked as a "laborer" with the firm "Elegant."  He also stated that he had then been a worker in a glass factory in Dresden, Germany, from March 1943 to May 1945.

16.  In making these claims, Defendant concealed his service, from January 1943 until at least May 1944, in the 1st and 3rd Commissariats of the Ukrainian Auxiliary Police in L'viv.

17.  Relying upon Defendant's misrepresentations, the DPC determined that Defendant was an eligible Displaced Person.

18.  On or about June 29, 1950, Defendant filed an
Application for Immigration Visa and Alien Registration with the
American Consulate in Munich, Germany, to obtain a non-quota
immigration visa to the United States under the amended DPA.

19.  On his visa application, Defendant misrepresented his
residence from 1943 to 1944, stating that he had resided in
Dresden, Germany, from March 1943 to May 1945.

20.  On his visa application, Defendant concealed that he
resided in L'viv between January 1943 and at least May 1944.

21.  In the course of applying for a non-quota immigration
visa under the amended DPA, Defendant orally swore to the truth
of the information on his visa application.

22.  Based on the false information provided by Defendant to
U.S. authorities, on or about June 29, 1950, Defendant was issued
Immigration Visa No. I-501861 under the amended DPA.

23.  Defendant used this immigration visa to enter the
United States at the Port of Boston, Massachusetts, on or about
July 22, 1950.

24.  On or about July 30, 1970, Defendant signed and filed a
Petition for Naturalization with the United States Immigration
and Naturalization Service.  He orally swore to the truth of the
information he provided therein.

25.  On September 8, 1970, the United States District Court
for the Northern District of Illinois granted Defendant's

- 8 -

Certificate of Naturalization, pursuant to Section 340(a) of the Immigration and Nationality Act, 8 U.S.C. § 1451(a), because Defendant illegally procured his admission into this country and his naturalization.

27.  Defendant's last known address was 9585 45th Way North, Pinellas Park, Florida, 33782-5506.  Defendant permanently departed from the United States on or before November 15, 2006.


## DECLARATION IN LIEU OF JURAT

### (28 U.S.C. § 1746)

I declare under penalty of perjury that the foregoing is true and correct.  Executed this  13th  day of November, 2006.

Dr. Elizabeth B. White
Chief Historian and Deputy Director
Criminal Division
Office of Special Investigations
United States Department of Justice
John C. Keeney Building
10th & Constitution Ave., NW
Suite 200
Washington, D.C. 20530
(202)616-2492

## CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| United States of America    //001 | Orest Galan |

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF**
**(EXCEPT IN U.S. PLAINTIFF CASES)**

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT    99999
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

William Henry Kenety V
U.S. Dept. of Justice, Criminal Division, Office of Special Investigations
10th St. and Constitution Ave., NW
John C. Keeney Building, Ste. 200
Washington, DC 20530
202-616-2492

CASE NUMBER  1:06CV01962

JUDGE: Royce C. Lamberth

DECK TYPE: General Civil

DATE STAMP: 11/16/2006

### II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ( •) 1 U.S. Government Plaintiff
- ( ) 2 U.S. Government Defendant
- ( ) 3 Federal Question (U.S. Government Not a Party)
- ( ) 4 Diversity (Indicate Citizenship of Parties in item III)

### III CITIZENSHIP FOR PLAINTIFF A...

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ( ) 1 | ( ) 1 | Incorporated or Principal Place of Business in This State | ( ) 4 | ( ) 4 |
| Citizen of Another State | ( ) 2 | ( ) 2 | Incorporated and Principal Place of Business in Another State | ( ) 5 | ( ) 5 |
| Citizen or Subject of a Foreign Country | ( ) 3 | ( ) 3 | Foreign Nation | ( ) 6 | ( ) 6 |

### IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

**( ) A. Antitrust**
- [ ] 410 Antitrust

**( ) B. Personal Injury/ Malpractice**
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Medical Malpractice
- [ ] 365 Product Liability
- [ ] 368 Asbestos Product Liability

**( ) C. Administrative Agency Review**
- [ ] 151 Medicare Act

Social Security:
- [ ] 861 HIA ((1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g)
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g)

Other Statutes
- [ ] 891 Agricultural Acts
- [ ] 892 Economic Stabilization Act
- [ ] 893 Environmental Matters
- [ ] 894 Energy Allocation Act
- [ ] 890 Other Statutory Actions (If Administrative Agency is Involved)

**( ) D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**( ) E. General Civil (Other)    OR    ( ) F. Pro Se General Civil**

Real Property
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent, Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

Personal Property
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

Bankruptcy
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

Prisoner Petitions
- [ ] 535 Death Penalty
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition

Property Rights
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 840 Trademark

Federal Tax Suits
- [ ] 870 Taxes (US plaintiff or defendant
- [ ] 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
- [ ] 610 Agriculture
- [ ] 620 Other Food &Drug
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 630 Liquor Laws
- [ ] 640 RR & Truck
- [ ] 650 Airline Regs
- [ ] 660 Occupational Safety/Health
- [ ] 690 Other

Other Statutes
- [ ] 400 State Reapportionment
- [ ] 430 Banks & Banking
- [ ] 450 Commerce/ICC Rates/etc.
- [ ] 460 Deportation

- [ ] 470 Racketeer Influenced & Corrupt Organizations
- [ ] 480 Consumer Credit
- [ ] 490 Cable/Satellite TV
- [ ] 810 Selective Service
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 875 Customer Challenge 12 USC 3410
- [ ] 900 Appeal of fee determination under equal access to Justice
- [ ] 950 Constitutionality of State Statutes
- [X] 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| O  G. *Habeas Corpus/ 2255* | O  H. *Employment Discrimination* | O  I. *FOIA/PRIVACY ACT* | O  J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| O  K. *Labor/ERISA (non-employment)* | O  L. *Other Civil Rights (non-employment)* | O  M. *Contract* | O  N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding   O 2 Removed from State Court   O 3 Remanded from Appellate Court   O 4 Reinstated or Reopened   O 5 Transferred from another district (specify)   O 6 Multi district Litigation   O 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**
i8 U.S.C. 1451(a) - This suit is to revoke the citizenship of Orest Galan, a naturalized citizen.

| VII. REQUESTED IN COMPLAINT | CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23 | DEMAND $ _____ | Check YES only if demanded in complaint |
|---|---|---|---|
| | | JURY DEMAND:  YES ☐  NO ☐ | |

| VIII. RELATED CASE(S) IF ANY | (See instruction)   YES ☐   NO ☒ | If yes, please complete related case form. |
|---|---|---|

DATE  Nov. 16, 2006       SIGNATURE OF ATTORNEY OF RECORD   *Rudolph Contreras*

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.